UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MOHAMUD MOHAMED,

    Plaintiff,

v.

F/V NORTHERN VICTOR, et al.,

    Defendants.

CASE NO. C05-2019JLR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

    The court held a bench trial in this matter on November 20, 2006. The court has examined the parties' evidence, considered testimony, and heard counsel's arguments. The court has also reviewed the deposition transcripts submitted by counsel (Dkt. ## 41, 42, 43). The court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. Plaintiff Mohamud Mohamed is a Somali national who came to this country as a refugee in 2001.

2. Shortly after arriving in the United States, Mr. Mohamed sought treatment for various ailments, including back pain. In late 2001, his doctors performed a Magnetic Resonance Imaging ("MRI") test, which indicated degenerative disc

ORDER – 1

disease. Mr. Mohamed treated his on-and-off pain with ibuprofen and underwent physical therapy. He occasionally reported to his treating physicians for further evaluation.

3. In June 2002, Mr. Mohamed saw Doctor Kirsten Paynter, who specializes in rehabilitation medicine. According to Dr. Paynter's chart notes, Mr. Mohamed was contemplating getting a job on a fishing boat in Alaska. Dr. Paynter encouraged him to seek lighter-duty employment and cautioned him against "hard labor types of positions" given his spine anatomy. Exs. 13-67, 13-68. Her chart notes also indicate that she told him that it was not "life-and-death" and that he was "free to choose to do what he wishes," but that hard labor could bring about more problems. Id.

4. Mr. Mohamed continued to seek medical attention related to back pain through October 2002. During this time period, Mr. Mohamed held various temporary jobs, some of them light-duty, some heavy-duty.

5. From November 2001 until September 2003, Mr. Mohamed's back pain never required him to miss days of work.

6. In September 2003, while working for a manufacturing company doing medium-duty labor, Mr. Mohamed suffered a back injury when he bent over to pick up an item off of the floor. Mr. Mohamed saw Doctor Aleksandra Zietak, who concluded that Mr. Mohamed had suffered a "lumbar contusion." Exs. 13-173, 13-177. She directed him to take ibuprofen, ice his back, and start physical therapy. Ex. 13-173.

7. In total, Mr. Mohamed missed three days of work related to his September 2003 back injury.

8. According to the chart notes, Dr. Zietak reviewed an MRI of Mr. Mohamed's back and communicated to Mr. Mohamed that the test results were "fine." Ex. 13-177.

ORDER – 2

|   |   |
|---|---|
|   | After roughly four weeks of treatment, Dr. Zietak discharged Mr. Mohamed with no work restrictions.  Exs. 13-180, 13-183. |
| 9. | In June 2004, Mr. Mohamed applied to work for Defendant Icicle Seafoods, Inc. ("Icicle Seafoods") as a fish processor.  Mr. Mohamed had not sought medical treatment related to his back since Dr. Zeitak's discharge eight months prior. |
| 10. | At the time Icicle Seafoods hired him, Mr. Mohamed had limited ability to read and comprehend written English. |
| 11. | As a prerequisite to a job offer, Icicle Seafoods required Mr. Mohamed to fill out several forms, including a health questionnaire.  Mr. Mohamed did not understand most of the terms on the health questionnaire form and filled out his responses with the help of another Somali national who was also applying for a job. According to Mr. Mohamed, this other Somali told him where to check the appropriate boxes on the health questionnaire. |
| 12. | In response to a question regarding whether he had suffered a prior back injury or strain, Mr. Mohamed checked a box marked "N" for "no."  Ex. 14-30.  In fact, he checked "N" in response to all other questions, save for two: he checked "Y" in response to a question of whether he had adequate vision and to a question of whether he had a history of asthma.  Id. |
| 13. | Upon receipt of Mr. Mohamed's application, Icicle Seafoods interviewed him for the fish processor position.  Mr. Mohamed did not have difficulty carrying on a basic conversation in English with Icicle Seafoods's staff. |
| 14. | Icicle Seafoods hired Mr. Mohamed to work aboard the Defendant vessel, the F/V NORTHERN VICTOR. |
| 15. | As a fish processor, Mr. Mohamed's task was to load pans of fish product from a conveyer belt onto a freezer shelf, or "plate."  The freezer's plates stacked one on top of another, with the lowest plate at a fixed position six inches from the floor. |

ORDER – 3

      The pans of fish weighed somewhere between fifteen to seventeen pounds. There were approximately eighteen shelves in the freezer unit.

16. The parties agree that loading the upper freezer plates did not pose a safety concern; the parties strongly disagree over the relative safety of loading pans onto the plates in the mid to lower range of the freezer unit.

17. Mr. Mohammed worked with five other seamen unloading the conveyer belt and loading the pans of fish product onto the freezer plates.

18. The pans of fish product moved relatively slowly on the conveyer belt, at a rate of roughly six per minute. Crozer Dep. at 13-14. On average, each employee would load one tray per minute. Id. The court does not find credible Mr. Mohamed's testimony that the fish trays came at a rapid rate of ten per minute per person. The court is also not persuaded that Mr. Mohamed's superiors constantly told him to work faster.

19. Crew members had enough space (between the conveyer belt and the freezer) to turn around and place the pans of fish product on the plates. Id. at 12.

20. To reach the lower shelves, the fish processors were trained to kneel or squat. Id. at 12-13. The vessel furnished knee pads to the crew for this purpose. Id. at 13. The court is not persuaded that superiors instructed Mr. Mohamed to reach the lowest shelves by bending or twisting from the waist.

21. According to the vessel's safety manager, the production manager directs the fish processors loading the trays to break off into pairs. Id. at 39. If necessary, one member of the pair could hand the pans of fish to the other worker, who could kneel or squat in order to reach the lower shelves. Id.

22. The crew members could adjust the upper shelves to bring them within reach.

23. The court does not find credible Mr. Mohamed's contention that he had no control over how to load the pans onto the freezer plates.

ORDER – 4

24. The court finds credible the vessel's safety manager's testimony that, in five years, he has not heard of any back-related complaints from fish processors performing Mr. Mohamed's task.

25. Mr. Mohamed did not kneel to perform the task of loading the freezer unit; rather, he bent over in order to reach the lower shelves.

26. On August 8, 2004, Mr. Mohamed hurt his back while bending over to place a plate on one of the freezer unit's lower shelves. He heard a "pop" and thereafter, felt pain and experienced a loss of mobility.

27. Mr. Mohamed complained to his superiors about his back pain. At the time of injury, the vessel was anchored in a remote location in Alaska. His superiors arranged for him to depart the vessel a few days after the incident in order to obtain medical treatment at the Iliuliuk Clinic in Alaska.

28. Upon his return to Seattle a few days later, Mr. Mohamed went to Valley Medical Center where he saw Doctor John Lazzaretti. Exs. 13-254-270. Dr. Lazzaretti gave Mr. Mohamed some pain relief medication, ordered an MRI, and subsequently diagnosed him as suffering from a broad-based disc protrusion with an annular tear. Id.

29. In early September 2004, Dr. Lazaretti referred Mr. Mohamed to a physical medicine and rehabilitation specialist, Doctor Kaya Hasanoglu. After discussing treatment options with Mr. Mohamed, Dr. Hasanoglu gave Mr. Mohamed a series of steroid injections in his spine over a period of several months. Exs. 13-272-312. Mr. Mohamed also attended physical therapy sessions and a work conditioning program during this time.

30. In May 2005, Mr. Mohamed's back problem became increasingly symptomatic when he attempted to do some light-duty housework. Again, he saw Dr. Hasanoglu who noted a severe level of discomfort. Exs. 13-352, 13-360. When

ORDER – 5

Mr. Mohamed's condition did not improve with conservative treatment, Dr. Hasanoglu referred him to Doctor Mark Remington for a surgical consultation. Dr. Remington performed a microdiscectomy in September 2005. Ex. 13-410.

31. In late 2005, Mr. Mohamed began a more aggressive work conditioning, or rehabilitative "hardening" program, with the Peoples Injury Network. He completed the program in February 2005; the providers at Peoples Injury Network released him for medium-duty work. Exs. 13-463, 13-465.

32. At the time of trial, Mr. Mohamed was working as a valet in a parking lot.

33. Defendants paid for Mr. Mohamed's medical expenses in the amount of $51,866.44.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this matter pursuant to 46 U.S.C. § 688 (the "Jones Act") and 28 U.S.C. § 1333 (general maritime law).

**Maintenance and Cure**

2. When a seaman is injured in the service of his vessel, the shipowner has an obligation to pay maintenance (compensation for room and board) and cure (payments for medical treatment necessary to restore the seaman to health). Vaughan v. Atkinson, 369 U.S. 527, 532 n.4 (1962); MARTIN J. NORRIS, THE LAW OF SEAMEN §§ 26:5-26:6 (3d ed. 1985) (defining maintenance and cure). A seaman's entitlement to maintenance and cure continues until he reaches "maximum cure" – a recovery as complete as the injury allows. Permanente S.S. Corp. v. Martinez, 369 F.2d 297, 298-99 (9th Cir. 1966).

3. The court resolves any doubts as to the seaman's right to receive maintenance and cure in favor of the seaman. Vaughan, 369 U.S. at 532.

ORDER – 6

4. When a seaman intentionally conceals his medical condition to a shipowner, he may lose his entitlement to maintenance and cure. Burkert v. Weyerhaeuser S.S. Co., 350 F.2d 826, 829 n.4 (9th Cir. 1965).

5. A defendant must show that the seaman concealed a medical condition that "he kn[ew] or should [have] know[n] is related to the illness or injury for which maintenance and cure are requested." Omar v. Sea-Land Serv., Inc., 813 F.2d 986, 990 (9th Cir. 1987) (citing Sammon v. Cent. Gulf S.S. Corp., 442 F.2d 1028, 1029 (2d Cir. 1971) ("The concealment of a previous condition is fraudulent only if the seaman knows or reasonably should know that the concealed condition is relevant.")).[1]

6. The defendant must satisfy its burden with "substantial evidence." Burkert, 350 F.2d at 831.

7. Courts take into consideration a seaman's language skills in assessing whether he has intentionally concealed a preexisting medical condition. Ahmed v. U.S., 177 F.2d 898, 900 (2nd Cir. 1949) (rejecting intentional concealment defense where seaman had limited understanding of English and where doctor had previously discharged him as fit for duty).

---

[1] Defendants urge this court to adopt a rule articulated by the Fifth Circuit in McCorpen v. Cent. Gulf SS Corp., 396 F.2d 547 (5th Cir. 1968), which allows a finding of intentional concealment even if the seaman has a subjective belief that his medical history is irrelevant to the question of whether he can perform the job. In McCorpen, the court held that when the employer affirmatively asks a seaman about a pre-existing condition in a pre-employment questionnaire, what the seaman knew (or should have known) regarding the relevance of his preexisting condition is immaterial. Id. at 548-49. Thus, where discovery reveals that a seaman's answer on an employment questionnaire is inconsistent with a diagnosis in his medical history, a defendant prevails on what would otherwise be the most contested element of intentional concealment – i.e., whether the seaman has engaged in wilful misconduct. The Ninth Circuit has not directly ruled on whether the seaman's subjective belief matters, but at least implicitly rejected the McCorpen standard in Omar when it cited Second Circuit authority, which McCorpen directly rejected. See McCorpen, 813 F.2d at 990 (rejecting Sammon, 442 F.2d at 1029).

ORDER – 7

8. Under the circumstances presented, the court concludes that Defendants have not met their burden to show by substantial evidence that Mr. Mohamed engaged in culpable conduct. Although Mr. Mohamed did not answer the medical questionnaire accurately, he testified that he did not understand substantial portions of the form.

9. The evidence suggests that Mr. Mohamed could understand questions posed to him orally; however, that same evidence is not sufficient to demonstrate a commensurate level of reading comprehension.

10. The court rejects Defendants' argument that, because Mr. Mohamed accurately marked "Y" in two places on the health questionnaire, he must have understood its contents. Mr. Mohamed testified that the man who helped him fill out the form knew he had asthma. Further, answering "yes" to two unrelated questions is not inconsistent with Mr. Mohamed's testimony that, at the time, he did not understand the question regarding pre-existing back-pain. It is also not inconsistent with Mr. Mohamed's testimony that he simply marked boxes on the form as instructed.

11. Further, Mr. Mohamed testified that he believed he had no work restrictions and that he was fit for duty. Indeed, despite a history of lower back pain, he had never missed work before on account of his pain, save for three days in September 2003. His testimony that he believed himself fit for duty is corroborated by the fact that he had received no medical attention relating to back pain for some eight months prior to applying for a job with Icicle Seafoods. At his last appointment relating to his back problem, Dr. Zeitak cleared him for work *without restrictions*.

12. Based on the above, the court concludes that Defendants are not entitled to restitution of the maintenance and cure payments that they have furnished to Mr. Mohamed.

ORDER – 8

13. The court orders Defendants to pay Mr. Mohamed maintenance in the amount of $1,224.92, which the parties agree remains outstanding. See Dkt. # 31 at 3 (Pretrial Order). Defendants have paid all cure.

14. The court concludes that Mr. Mohamed is not entitled to pre-judgment interest because Mr. Mohamed has failed to provide the court with any evidence from which the court can determine the date on which he should have received his payments from Icicle Seafoods.

15. Pursuant to 28 U.S.C. § 1961, Mr. Mohamed is entitled to post-judgment interest at a rate of 4.96 % to run from the date that the court enters judgment.

**Seaworthiness**

16. A ship owner has an absolute duty to furnish a seaworthy ship. Ribitzki v. Canmar Reading & Bates, Ltd. P'ship, 111 F.3d 658, 664 (9th Cir. 1997) (citing Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960)).

17. A vessel's unseaworthiness "may arise from any number of circumstances, including an insufficient number of men assigned to perform a shipboard task, or the existence of a defective condition, however temporary, on a physical part of the ship." Id. (citing Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499 (1971)). Likewise, an unsafe method of operation may constitute unseaworthiness. Morales v. Gavelston, 370 U.S. 165, 170-71 (1962).

18. "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell, 362 U.S. at 550.

19. In order to prevail on a seaworthiness claim, Mr. Mohamed must show that the warranty of seaworthiness applied to him and his task, he was injured by equipment that was either part of the ship or an appurtenant appliance, the

ORDER – 9

equipment was not reasonably fit for its intended use, and that the unseaworthy condition proximately caused his injury. See Ribitzki, 111 F.3d at 664.

20. The parties do not dispute the first two elements, namely, that the warranty of seaworthiness applied to Mr. Mohamed and his task and that his injury occurred while he was loading pans of fish onto freezer plates aboard the F/V NORTHERN VICTOR.

21. The court nevertheless concludes that Mr. Mohamed's seaworthiness claim fails because he has not shown that his work station aboard the vessel was unfit for the task. In sustaining his injury, Mr. Mohamed does not contend that he fell or slipped or that the freezer plates malfunctioned. Instead, he argues that Defendants oversaw an unseaworthy method of operation when they permitted the crew to load shelves positioned too close to the floor. Said another way, Mr. Mohamed contends that his work station was ergonomically flawed.

22. The court concludes that Mr. Mohamed has failed to prove that a work condition aboard the F/V NORTHERN VICTOR was unseaworthy. Mr. Mohamed's work station was sufficiently manned and configured to allow Mr. Mohamed to safely perform the task.

23. The evidence does not indicate that Mr. Mohamed's superiors instructed or required him to perform the task in the manner he selected. Cf. Reyes v. Delta Dallas Alpha Corp., 199 F.3d 626, 630 (2nd Cir. 1999) (denying summary judgment to shipowner where vessel supervisor *ordered* seaman to carry 150 pound bag of ice up stairs without assistance). Indeed, Defendants present evidence that the production manager instructed the crew to work in teams and furnished knee pads to the crew so that they could kneel to access the lower plates.

24. The fact that Mr. Mohamed may have chosen to bend over rather than kneel does not make the method of operation unseaworthy. See Am. Seafoods Co. v.

ORDER – 10

Nowack, No. C01-161P, 2002 WL 31262107, at *3 (W.D. Wash. April 11, 2002) (granting summary judgment on seaworthiness claim where seaman, tasked to attach heavy hoses, chose to squat rather than lie down, resulting in knee injuries).

25. The court does not find persuasive the testimony of Mr. Mohamed's ergonomic expert who based his assumptions about the method of operation solely on Mr. Mohamed's description. In its factual findings, the court accepted the safety manager's testimony over Mr. Mohamed's regarding the work station set-up.

26. Based on the above, the court concludes that Mr. Mohamed has failed to meet his burden to show that Defendants breached their duty to provide a seaworthy vessel.

**Negligence**

27. The elements of a Jones Act negligence claim are duty, breach, notice, and causation. Ribitzki 111 F.3d at 664.

28. To recover under the Jones Act, Mr. Mohamed has the burden of establishing by a preponderance of the evidence (1) negligence on the part of his employer, and (2) that the negligence was a cause, however slight, of his injuries. Havens v. F/T Polar Mist, 996 F.2d 215, 218 (9th Cir. 1993). The quantum of evidence required to support a finding of negligence under the Jones Act is lower than that which is required for common law negligence. Id.

29. The court concludes that Mr. Mohamed has failed to prove that Icicle Seafoods breached its duty to him. Icicle Seafoods exercised reasonable care that a reasonable ship owner would exercise under the circumstances.

30. The court declines to infer negligence on the part of Icicle Seafoods merely because an injury occurred.

31. Mr. Mohamed's superiors furnished equipment that made the task reasonably safe and assigned an adequate number of crew members to the position. There is

ORDER – 11

nothing inherently unsafe about the freezer unit or the configuration of Mr. Mohamed's working station. By necessity, a vessel must make efficient use of space.

32. As noted previously, the production manager showed the crew how to perform the task safely; Mr. Mohamed does not contend that his crew members would have refused or been unable to help him had he asked.

33. Mr. Mohamed's injury was an unfortunate event suffered during the execution of a routine task. Icicle Seafoods did not have a duty to caution Mr. Mohamed of the obvious – i.e., that bending or twisting from the waist put unnecessary strain on his back.

## ORDER

Based on the foregoing findings of fact and conclusions of law, the court orders as follows:

1. Mr. Mohamed shall recover unpaid maintenance in the amount of $1,224.92 plus post-judgment interest at a rate of 4.96 % to run from the date that the court enters judgment.

2. The clerk shall enter judgment consistent with this order.

Dated this 2nd day of January, 2007.

JAMES L. ROBART
United States District Judge

ORDER – 12